DECISION.
{¶ 1} Defendant-appellant Curtis Holloway appeals his convictions for two counts of felonious assault, each with a gun specification. After a jury found Holloway guilty, the trial court sentenced him to a total of five years in prison. We affirm.
 I. The Shooting {¶ 2} Martez Williams, the fifteen-year-old victim, testified for the state. Williams testified that, on the night of July 18, 2003, there was a fight at the Millvale school between teenage boys from two neighborhoods, Millvale and Moosewood. According to Williams, fights between the boys from Millvale and Moosewood were quite common. Williams lived in Moosewood. Williams testified that his cousin, Christopher Bailey, and Holloway both lived in Millvale.
 {¶ 3} Williams testified that, on this particular night, he went to the fight with several friends, including Mike Mingle and James, also known as Bump. Williams said he went there not to fight, but to stop Bump from fighting his cousin, Bailey.
 {¶ 4} As Williams and his friends arrived at the Millvale school, there were about fifteen people from Moosewood and ten people from Millvale, including Holloway. Williams testified that some people had already begun to fight. Bump and Bailey soon squared off to begin fighting. As Bump and Bailey faced each other, Williams jumped in between the two and held his hands out towards each of them, as if to stop them.
 {¶ 5} Williams testified that Holloway had been standing next to Bailey. When Williams jumped in between Bump and Bailey, he saw Holloway pull a short black gun out of his pants. He noticed that Holloway's hand holding the gun was shaking. Williams testified that Holloway shot the gun once, hitting Williams in the thigh. After the gunshot, the crowd immediately dispersed, with everyone running toward their respective neighborhoods. Williams began walking away from the school.
 {¶ 6} Cincinnati police officer Kevin Kroger testified that he responded to a call about a shooting in Millvale. Arriving within two minutes of the call, Kroger testified that he found Williams about 50 yards from the school. He was standing on the sidewalk, leaning against a brick wall. Kroger asked Williams if he was coping with his injury, and Williams said that he was. Kroger then asked him where he was shot, and Williams showed the officer his right hip. Kroger testified that the wound was consistent with a gunshot wound.
 {¶ 7} Officer Kroger then asked Williams who had shot him. Williams, without any hesitation, replied that Curtis Holloway had shot him. Williams gave the police a description of Holloway and was soon taken by ambulance to Children's Hospital. Williams testified that he was treated at the hospital and released that night, and that the bullet remained in his leg.
 {¶ 8} Williams testified that although Holloway was three years older, he was familiar with him because he had seen him in Moosewood several times. Williams also knew Holloway from times that Williams had gone to the Millvale Recreation Center. In addition, Williams went to school with Holloway's sister, and several months before the fight, Williams had seen Holloway at the eighth-grade graduation of Williams and Holloway's sister.
 {¶ 9} Officer Kroger testified that, later in the evening, another officer saw a person matching Holloway's description. The officer told the man to stop, but he ran into the back of a house in Millvale. Many officers responded to the house, surrounded it, and eventually searched it. But they did not find the suspect.
 {¶ 10} In his defense, Holloway offered the testimony of his girlfriend, Barbara Snodgrass, and her mother, Patricia Ann Snodgrass. (We use first names for them because they have the same last name.) Barbara testified that, around the time of the shooting, she and Holloway had spent almost all of their time together. Holloway spent nights at her house, and he would also be there anytime he was not at work.
 {¶ 11} Barbara testified that, on the day of the shooting, Holloway had spent the night at her house and then had spent all day at the house with her. She testified that she was sick that day due to her pregnancy, and that Holloway was also sick, so they had napped often during the day. At about three in the afternoon, they both got up. They then went downstairs and watched a movie on television with Barbara's mother and Barbara's sisters.
 {¶ 12} Barbara testified that, later in the evening, Frank, a friend of Holloway's, came to the door. Frank told them that there was a lot of commotion outside. Barbara and her mother and sisters looked outside and saw numerous police cars surrounding a house down the street. The house surrounded was Frank's sister's house. Barbara testified that there were seven or eight police cruisers. She testified that Holloway went across the street to talk to his mother, who was also outside observing the police. After a few minutes, Holloway returned to Barbara's house. Barbara testified repeatedly that Holloway had never been out of her sight the entire day of the shooting.
 {¶ 13} Barbara's mother's testimony echoed Barbara's. Patricia Ann testified that, on the day of the shooting, she arrived home from work at about two in the afternoon. She said that Barbara and Holloway, along with her other two daughters, were at home. Later in the day, Holloway's friend Frank knocked on the door and talked to Holloway. They all stepped outside to look at the numerous police cars down the street. She testified that Holloway went across the street to talk to his mother, but soon came back. Patricia Ann testified that, as far as she knew, Holloway was in her house the entire day.
 {¶ 14} Holloway testified on his own behalf. He said that he was with Barbara in her house the entire day of the shooting. After napping early in the afternoon, he watched a movie with Barbara, her mother, and her sisters.
 {¶ 15} Holloway testified that, later in the evening, his friend Frank appeared at the door. Holloway clarified that Frank was actually Christopher Bailey. But Holloway testified that he did not know until the trial that Bailey was Williams's cousin. Holloway testified that Frank seemed nervous. He was sweating and talked quickly. Holloway and the others stepped outside and observed the numerous police cars surrounding Frank's sister's house. Holloway said he went across the street to talk to his mother, while Frank stayed on Barbara's porch. After a short time, Holloway returned to Barbara's house.
 {¶ 16} Holloway also offered the testimony of Karen Salchli, the assistant director in the Health Information Management Department at Children's Hospital. She testified that she had searched the hospital's records and had not found any record for treatment given to Martez Williams on July 18, 2003. She testified that if a child was brought to the hospital in an extreme emergency, an alias name would be given to the child until the child was stable. But she testified that once the child was stable, the information was changed in the computer to reflect the legal name of the child.
 II. Sufficiency and Manifest Weight {¶ 17} In his single assignment of error, Holloway argues that his convictions were supported by insufficient evidence and were against the manifest weight of the evidence.
 {¶ 18} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[1] A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a conviction is a question of law.[2] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proved beyond a reasonable doubt.[3]
 {¶ 19} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[4] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[5] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[6]
 {¶ 20} Holloway's two convictions were for felonious assault. For one conviction, the state had to prove beyond a reasonable doubt that Holloway had knowingly caused serious physical harm to another.[7] For the other, the state had to prove that Holloway had knowingly caused, or attempted to cause, physical harm to another by means of a deadly weapon.[8] For the firearm specifications, the state had to prove that Holloway had a firearm on or about his person or under his control while committing his offenses, and that he had either displayed the firearm, brandished it, indicated that he possessed it, or used it to facilitate his offenses.[9]
 {¶ 21} The state offered the testimony of Williams, the shooting victim. Williams testified that he saw Holloway standing next to Bailey, and that he saw Holloway remove a short black gun from his pants. Williams noticed that Holloway's hand was shaking. Williams testified that Holloway shot the gun once, wounding Williams in the thigh. Williams was familiar with Holloway and had seen him in various places in their neighborhoods for several years. Officer Kroger testified that when he arrived on the scene minutes after the shooting, Williams told him that Holloway had shot him.
 {¶ 22} We conclude that a rational factfinder, viewing the evidence in a light most favorable to the state, could have found that Holloway had committed both counts of felonious assault, along with the gun specifications. Therefore, we conclude that sufficient evidence supported Holloway's convictions for felonious assault and the gun specifications.
 {¶ 23} While Holloway offered alibi testimony from two witnesses along with his own testimony, it was up to the jury to weigh the credibility of each witness. The jury was free to believe none, some, or all of any witness's testimony. Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Holloway guilty of his offenses.
 {¶ 24} Therefore, we overrule Holloway's assignment of error and affirm the trial court's judgment.
Judgment affirmed.
Hildebrandt, P.J., and Gorman, J., concur.
[1] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[2] Id.
[3] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[4] See State v. Thompkins, supra, at 387.
[5] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[6] See State v. Martin, supra.
[7] R.C. 2903.11(A)(1).
[8] R.C. 2903.11(A)(2).
[9] R.C. 2941.145(A).